


# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT JACKSON

| | |
|---|---|
| **DARLENE TAYLOR as SURVIVING SPOUSE of DARRELL TAYLOR,**    ) <br> Employee,    ) <br> ) | **Docket No. 2023-07-5405** |
| **v.**    ) | |
| **DALE'S RECYCLING,**    ) <br> Employer,    ) | **State File No. 860327-2023** |
| **And**    ) | |
| **INS. CO. OF THE WEST,**    ) <br> Carrier.    ) | **Judge Allen Phillips** |

---

## COMPENSATION ORDER

---

At a Compensation Hearing on March 11, 2025, Mrs. Taylor requested benefits for her husband's death from a heart attack. Dale's contended the heart attack did not arise out of the employment. For the following reasons, the Court holds Mrs. Taylor is entitled to the requested benefits.

### History of Claim

*The incident*

On June 22, 2023, Mr. Taylor was pulling a trailer of scrap metal for Dale's to a destination in Kentucky. While passing through a construction zone, a local sheriff's deputy, Dennis Poteet, was driving behind Mr. Taylor and saw metal falling out of the trailer and other pieces about to fall. He pulled Mr. Taylor over after he passed the construction zone.

The deputy said Mr. Taylor appeared anxious and nervous and did not know metal was falling out of the trailer. Deputy Poteet told him to secure it before proceeding. Mr. Taylor then stepped on one of the trailer's rear wheels to access an attached ladder, climbed inside the trailer, and began to move metal away from the edges.

1

Deputy Poteet went to his cruiser to answer a phone call. He said that he could see Mr. Taylor at the back of the trailer, but when Mr. Taylor began "working his way around the edge," he lost sight of him.

When Deputy Poteet finished his phone call about ten minutes later, he still did not see Mr. Taylor. He searched for him inside and outside the cab of the truck. He then climbed the ladder to look inside the trailer and found Mr. Taylor lying on the metal near the tailgate, "staring directly into the sunlight." Deputy Poteet found no pulse, so he called emergency medical services, who upon arrival confirmed Mr. Taylor was dead. A few days later, the local coroner completed a report stating Mr. Taylor's immediate cause of death was cardiorespiratory arrest related to chronic hypertension and diabetes.

*The claim and discovery*

In August 2023, Mrs. Taylor filed a Petition for Benefit Determination stating that she had not received a First Report of Injury regarding her husband's death. She requested a report and death benefits for herself and Mr. Taylor's stepson, who was enrolled as a full-time college student. Dale's then completed a First Report, stating Mr. Taylor died from "Natural Causes (Massive Heart Attack)." Dale's carrier denied the claim based on Mr. Taylor's preexisting conditions.

The parties deposed Deputy Poteet, who said Mr. Taylor was driving appropriately. However, Mr. Taylor seemed nervous and anxious because of what the deputy perceived was the interaction with him. The deputy also testified the trailer was "extremely tall for a dump trailer" (about 14 feet) and that June 22 was a "very warm day." He found Mr. Taylor very near the tailgate, lying back as if he had simply sat down.

The parties also deposed Dale's Vice President of Operations, who knew no details of the incident except that Mr. Taylor died from a heart condition. He wrote in the First report that Mr. Taylor died from natural causes because that was "verbatim" what the coroner told him. He also said Dale's drivers are always responsible for the loads on the trucks they are driving.

The parties admitted two medical records from Mr. Taylor's primary care provider, from his most recent DOT examination, and from his drug store. The medical records from December 2022 and January 2023 included that he was taking medications for high blood pressure, diabetes, and high cholesterol. His total cholesterol in December 2022 was 153, with an LDL level of 46 and an HDL level of 94. His hemoglobin A1C was 6.4, and his blood pressure was 150/84. In January, his blood pressure was 132/84. A Department of Transportation physical in April 2023 cleared him to drive a truck. His blood pressure was 118/70. The drug store records showed he filled his medications at regular intervals.

2

Mrs. Taylor retained cardiologist Dr. Arvindh Kanagasundram. He completed both medical school and his cardiology residency at Vanderbilt, where he has taught for 11 years. He is Board-certified in both cardiology and electrophysiology and spends 80% of his time evaluating and treating patients with heart arrythmias and coronary artery blockages.

Dr. Kanagasundram said Mr. Taylor's positioning in the trailer was consistent with a sudden "catastrophic" cardiac event and he believed it resulted from physical and emotional stress in a patient with stable coronary disease. To a reasonable degree of medical certainty, Dr. Kanagasundram testified Mr. Taylor's death was "significantly more than 50%" caused by physiological changes related to physical and emotional stressors, and exposure to heat.

The physical stressors were climbing a tall ladder and moving metal. He described how this exertion causes the heart to work harder, which in turn requires additional blood flow. That flow may be diminished by a blocked coronary artery. Likewise, increased exertion might cause a coronary artery plaque to rupture and cause a blockage.

As to emotional stressors, Mr. Taylor was troubled by being pulled over, and the resulting adrenaline rush could have caused spasms in a blocked artery, which would also diminish blood flow. That in turn could trigger a heart attack.

Dr. Kanagasundram explained how heat can affect the heart by disturbing the electrolyte balance, which can lead to "malignant arrhythmias."

He cited articles from the Journal of the American Medical Association, the New England Journal of Medicine, and a scientific statement of the American Heart Association, which the doctor called "the definitive organization for cardiologists." Those documented the connection between exertion in men with coronary artery disease and plaque ruptures or heart arrythmias causing sudden death.

As to preexisting conditions, Dr. Kanagasundram considered that Mr. Taylor's cholesterol numbers were a "very, very good-looking lipid panel." His HDL (good cholesterol) reading of 94 and LDL (bad cholesterol) of 46 indicated Mr. Taylor had both a "good genetic predisposition" and did not have a "terrible lifestyle." The hemoglobin A1C of 6.4 and the blood pressure readings suggested well-controlled conditions. Overall, Mr. Taylor had stable coronary artery disease and was a low- to moderate-risk heart patient.

Dale's retained cardiologist Dr. Kishore Arcot, who is Board-certified in internal medicine and cardiovascular medicine. He practices at the Memphis Vein Center but said "60-70%" of his practice is cardiology. He believed he was more qualified than Dr.

3

Kanagasundram because he was a "clinical" cardiologist who treats heart patients as opposed to an "electrocardiologist." He did not believe electrocardiologists are fully qualified to "take care of heart attacks."

Dr. Arcot testified the primary cause of Mr. Taylor's heart attack was preexisting risk factors of being over age 45, a male, elevated blood pressure, type II diabetes, obesity, and high cholesterol. Given those risk factors, Dr. Arcot said "anyone" can "punch in the numbers" and see Mr. Taylor was at a 60-70% risk of a heart attack and "you don't have to be a physician." He said he did "not know what [Dr. Kanagasundram] went through," because "this is black and white."

Dr. Arcot said Mr. Taylor "most likely" died of a heart attack but talking to the deputy or moving metal is not what caused it. Rather, the heart attack "just happened" and simply bore a temporal relationship or was coincidental. Dr. Arcot believed Mr. Taylor could have just as likely have died then, the next day, two to four weeks later, or while "eating a Big Mac."

Dr. Arcot said, "if you look at the literature, [victims] get up in the morning early and then get heart attacks." Or they might say, "'I'm going to shovel snow,' open the door and then drop dead" before shoveling. In short, Dr. Arcot believed that although exertion can cause heart attacks, exertion alone will not. He said the "statistics" did not favor more exertion equaling more heart attacks. He cited no literature or source for the statistics.

*The trial*

Mrs. Taylor was the only witness. She testified her husband appeared normal when he left home the morning of June 22 and that he sounded normal when he called her about two hours later. She provided the coroner with Mr. Taylor's history of high blood pressure and diabetes. She also testified that her husband had faithfully taken his medications for several years and that none of his conditions was "out-of-control."

Mrs. Taylor argued that *Mitchell v. Bunge North America*, 2019 TN Wrk. Comp. App. Bd. LEXIS 15 (Apr. 16, 2019), is the only post-Reform Act case addressing heart attacks. She pointed out the Appeals Board noted pre-Reform law held the "causational key to recovery" was whether a heart attack precipitated by physical strain was caused by physical activity or exertion at work. Whether the exertion was extraordinary or whether the employee had preexisting conditions did not matter. *Id*. at *16. The Board held that reasoning remained the law except now an employee must show the heart attack arose primarily out of his employment. *Id*. at *16-17.

Regarding heart attacks caused by emotional stress, pre-Reform law held they must be "immediately precipitated by a sudden stressful event" rather than generalized employment conditions. *Id.* at *17. The Board stated the same is true under current law so

long as a heart attack resulting from an unusual stressful event arises primarily out of the employment. *Id.* at *18. Mrs. Taylor contended the testimony of Dr. Kanagasundram supports a finding that Mr. Taylor's heart attack was precipitated by both physical and emotional work-related stressors.

Dale's countered that the employee in *Mitchell* was found to have died from natural causes and so did Mr. Taylor. The widow in *Mitchell* claimed her husband died from both physical and emotional stress, as well as environmental factors, but she offered no specific proof of a specific event causing those. In its brief, Dale's admitted the incident occurred, but the "question before the Court is whether the heart attack arose primarily out of [his] employment." Dale's said the Court must rely on the expert's qualifications and opinions and pointed to Dr. Arcot's opinion.

The parties stipulated to certain facts should the Court find the claim compensable. First, under Tennessee Code Annotated section 50-6-210 (2024), Mrs. Taylor and the stepson were eligible for survivor's benefits payable at 66 2/3% of Mr. Taylor's weekly wages from the date of death through the stepson's 22nd birthday because he was enrolled in college. Second, Mrs. Taylor would be eligible for payments at 50% of Mr. Taylor's weekly wages under the terms of section 210.[1] Third, Mr. Taylor's average weekly wage was $969.94, and the burial expenses were $8,667.81.

**Findings of Fact and Conclusions of Law**

Mrs. Taylor must prove all elements of her claim by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6).

*Causation*

Mrs. Taylor must show to a reasonable degree of medical certainty that Mr. Taylor's death arose primarily out of his employment, meaning that the June 22 incident contributed more than 50% to his fatal heart attack when considering all causes. Shown to a reasonable degree of medical certainty means that the incident was more likely than not the cause. *Id.* at -102(12)(A)-(D).

Both parties identified *Mitchell* as the only post-Reform Act case addressing heart attacks, and the Court has found no other. In that case, the widow's claim was denied because she failed to prove her husband's fatal heart attack arose primarily out of his

---

[1] An amendment to section 210(e)(1), effective July 1, 2023, provided that a surviving spouse with no dependent children receives weekly payments of death benefits equal to 66 2/3% of the employee's average weekly wage. Mr. Taylor died on June 22, 2023, nine days before the effective date, when section 201(e)(1) provided for payments equal to 50% of the average weekly wage. The statute in effect as of the date of injury governs the rights of the parties under the workers' compensation law unless absent an indication of the Legislature's contrary intent. *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 368 (Tenn. 1998).

employment. *Mitchell*, at \*26. This case is distinguishable, and the Court finds Mr. Taylor's fatal heart attack *did* arise primarily out of his employment for several reasons.

First, the *Mitchell* claimant contended her husband died from physical exertion. But the proof showed the husband died a few minutes after sitting and talking to his co-workers. *Id.* at \*19. Conversely, Mr. Taylor died after climbing a 14-foot ladder and arranging scrap metal as confirmed by Deputy Poteet, the only eyewitness.

Second, the *Mitchell* claimant contended her husband's death was related to the emotional stress of learning a new computer system. But the Board found learning a new computer system was ordinary stress, not a sudden or unusual stressful event that triggered the heart attack. *Id.* at \*20.

Here, Mr. Taylor *did* encounter a sudden and unusual stressful event when he was stopped by law enforcement when driving safely and told metal was falling from his trailer. Those events were sudden and unusual, as a driver is not exposed to interactions with law enforcement as an ordinary part of his job, particularly when driving safely or when unknown to him, metal was falling from a trailer he was responsible for.

Third, the *Mitchell* claimant offered conflicting evidence of her husband's exposure to environmental factors. That inconclusive evidence in turn led to inadequate proof of a causal relationship between environmental factors and the heart attack. *Id.* at \*24. Here, the evidence is uncontroverted that Mr. Taylor was exposed to heat, and Dr. Kanagasundram explained the physical effects of it.

The Court also finds the medical proof shows Mr. Taylor's heart attack arose primarily out of his employment. Specifically, Dr. Kanagasundram's opinion contains the more probable explanation of what caused Mr. Taylor's death. *See Sanker v. Nacarato Trucks, Inc*., 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at \*12 (July 6, 2016). In making that determination, consideration is given to the physicians' qualifications, the circumstances of their examinations, the information available to them, and the importance attached to that information by other experts. *Lentz v. Coca-Cola Consol., Inc*., 2023 TN Wrk. Comp. App. Bd. LEXIS 34, at \*10 (July 19, 2023).

The physician's qualifications begin on equal footing, as both are cardiologists, but the Court finds Dr. Kanagasundram's qualifications are more impressive. Both were retained for litigation, so the circumstances of evaluation favor neither. Likewise, both physicians knew the details of the incident in context of the preexisting conditions.

However, the importance they attached to that information supports Dr. Kanagasundram's opinion. He explained how physical and emotional stressors led to the physiological changes causing Mr. Taylor's death, and how environmental factors affected those changes. He did not ignore other possible causes, as the definition of a compensable

6

injury requires. But he explained how those other possible causes were not the primary cause, and he backed his opinions with learned treatises.

Dr. Arcot was laser-focused on the preexisting conditions and made them the foundation of his opinions. He mentioned literature but did not produce it. Mr. Taylor did not die upon rising, thinking about work, or eating a Big Mac. He might have, but he didn't. Instead, Mr. Taylor died when exerting himself in the heat at work after an unexpected traffic stop. The Court cannot "punch in the numbers" and say otherwise. *See Lurz v. Int'l Paper Co.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 8, at *17 (Feb. 14, 2018). In sum, Dr. Kanagasundram provides the color to what Dr. Arcot sees as black and white. Mrs. Taylor has met her burden to show the evidence preponderates in her favor.

### *Calculation of benefits; fees and costs*

Under section 209(b)(3), death benefits are subject to the maximum total benefit, which is defined as 450 weeks times the state average weekly wage. Tenn. Code Ann. § 50-6-102(13)(D). On June 22, 2023, the state average weekly wage was $1,121, meaning the maximum total benefits in this case equal $504,450.

The parties stipulated Mrs. Taylor and the stepson were entitled to benefits for the 54.5 weeks between June 22, 2023, and the stepson's 22nd birthday on July 8, 2024, at a weekly rate of $646.66. This equals $35,242.97, and the Court orders Dale's to pay that accrued amount in a lump sum. They further stipulated Mrs. Taylor would be entitled to benefits at the weekly rate of $484.97 beginning July 9, 2024, so she is entitled to a lump sum of $17,041.85 from July 9 to March 11, 2025, the date of trial, or 35 weeks and one day.

Counsel submitted an affidavit in support of a fee of 20% of the total award, or $100,890 (20% x $504,450). As required by section 226(a)(2)(B), the Court finds the fee is justified under Supreme Court Rule 8, RPC 1.5 based on:

- the time and labor involved
- the difficulty of the questions
- the requisite skill required to litigate the case
- the customary fee for workers' compensation cases
- the amount of benefits at issue, and
- the results obtained.

After payment of the accrued benefits and deduction of attorney's fees, the remaining balance equals $351,275.18. Mrs. Taylor shall receive that amount in weekly payments of $484.97 for 724 weeks and two days under section 210(e).

Finally, Mrs. Taylor is awarded reimbursement of burial expenses in the stipulated amount of $8,667.81 and her discretionary costs of $4,436.10.

**IT IS, THEREFORE, ORDERED** as follows:

1. Dale's shall pay a total award of death benefits equaling $504,450 under section 209(b)(3) as follows:

   - $35,242.97 to Mrs. Taylor and Robert Mathis, stepson, for June 22, 2023, through July 8, 2024
   - $17,041.85 to Mrs. Taylor for July 8, 2024, through March 11, 2025, and
   - $351,275.18 to Mrs. Taylor in weekly installments of $484.97 for 724 weeks and two days subject to the limitations of section 210(e).

2. Mrs. Taylor is awarded burial expenses of $8,667.81 under section 204(c).

3. Mrs. Taylor's counsel is awarded an attorney's fee of 20% of the total award or $100,890. The fee is justified under Tennessee Supreme Court Rule 8, RPC 1.5.

4. Under section 239(c)(8) and Tennessee Rules of Civil Procedure 54.04 (2024), Dale's shall pay Mrs. Taylor's discretionary costs of $4,436.10 itemized as follows:

   - Dr. Kanagasundram deposition fee--$2,730
   - Court reporter for Deputy Poteet's deposition--$325.50
   - Court reporter for Bobby Dabbs's deposition--$428.50
   - Court reporter for Dr. Kanagasundram's deposition--$487.50
   - Court reporter for Dr. Arcot's deposition--$292.00
   - Court reporter for Compensation Hearing--$172.60.

5. Dale's shall pay the $150.00 filing fee to the Court Clerk within five business days of this order becoming final under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (2023), and for which execution may issue if necessary.

6. Unless appealed, this order shall become final 30 days after issuance.

7. Dale's shall file a Statistical Data Form (SD-2) with the Court Clerk within five business days of the date this order becomes final.

**ENTERED March 19, 2025**.

_Allen Phillips_
**JUDGE ALLEN PHILLIPS**
**Court of Workers' Compensation Claims**

8

**APPENDIX**

Exhibits:
1. Deposition of Dr. Arvindh Kanagasundram
2. Deposition of Dr. Kishore Arcot
3. Collective Medical Records
4. Deposition of Deputy Dennis Poteet
5. Marriage Certificate
6. First Report of Work Injury
7. Wage Statement
8. Bill of Lading
9. Robert Lee Mathis Birth Certificate
10. Documentation of Robert Mathis's enrollment in college
11. Photographs of scene
12. Deposition of Bobby Dabbs (Dale's representative)
13. Death Certificate

**CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent as indicated on March 19, 2025.

| Name | Email | Service sent to: |
| --- | --- | --- |
| Jonathan L. May, Employee's Attorney | X | jmay@forthepeople.com<br>jvavak@forthepeople.com |
| Richard Clark and Emily White, Employer's Attorneys | X | rclark@eraclides.com<br>ewhite@eraclides.com |

_____
**Penny Shrum, Court Clerk**
**Court of Workers' Compensation Claims**
**Wc.courtclerk@tn.gov**

9



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1.  Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2.  You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3.  You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4.  After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.


_____

*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived.  The following facts support my poverty.

1. Full Name:_____     2. Address: _____

3. Telephone Number: _____     4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

   My employer's address is: _____

   My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental  $ _____ per month

Groceries         $ _____ per month    Telephone      $ _____ per month

Electricity       $ _____ per month    School Supplies $ _____ per month

Water             $ _____ per month    Clothing       $ _____ per month

Gas               $ _____ per month    Child Care     $ _____ per month

Transportation    $ _____ per month    Child Support  $ _____ per month

Car               $_____ per month

Other             $ _____ per month (describe: _____ )

10. Assets:

Automobile               $ _____      (FMV) _____

Checking/Savings Acct. $ _____

House                    $ _____      (FMV) _____

Other                    $ _____      Describe:_____

11. My debts are:

| Amount Owed | To Whom |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT


Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.


_____
NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                                                RDA 11082